Please be seated. And will you call the last case of the day, please? BDSH 3305, Bower v. Bough v. Udall, C.J. Angel v. BNSF Ry. Co. v. Udall, and B.S. Price v. Ironhead. Mr. Angel? Thank you. May it please the Court? Yes, Your Honor. The case we're here on today involves a deceased by the name of Kenneth Lough, who in legal terms is known as an eggshell plaintiff or a thin-skulled plaintiff, as that term has been commonly used. And the reason we're here is regarding an auto accident he was in approximately two years before his death. As you can tell from the brief, Mr. Lough was born in 1938, and he had health problems stretching back at least to the mid to late 1970s. He had chronic obstructive pulmonary disease. He had problems with neck and back injuries dating back to a 1978 auto accident. He had depression dating back to at least 1985. And his conditions worsened over the years. Nonetheless, before this accident, he was able to enjoy motorcycling, doing some yard work, riding in the truck, going for breakfast, things like that. Well, the survival case is still alive, right? Correct. And actually that dives into my first point, which I will get to in just a second. But basically, after this accident, Mr. Lough was T-boned by the defendant, Leo Yerger, who was employed by UNSF Railway on October 19, 2007, in the morning. And then after that time, his condition just – his pain became worse. His condition became worse. He had more trouble doing simple activities. His depression became worse. And basically the pain just gradually took over, and he became more and more immobilized, which led to the COPD and the pneumonia, which eventually caused his death. Do you have an expert that said that? Yes, actually. The testimony of the experts in this case, their testimony was that the injuries – and this is, I think, what most of the dispute is over – the injuries themselves did not cause his death. If Mr. Lough had been just simply in the car accident, he would have had neck and back injuries, but he would have been okay as long as he never got the COPD or the pneumonia that he got. It's very similar to the victim in the Agmagon case. He had injuries which paralyzed him, and he would not have died from those injuries except for the fact that he became more susceptible to pneumonia. And for that reason, the underlying accident basically hastened not only Mr. Ruiz's death in the Agmagon case, but also Mr. Lough's death in this case here. The accident didn't cause the COPD, right? That is correct. He had that beforehand. That is correct. And I suppose that may be one difference between the Agmagon case and this case, that presumably in the Agmagon, the decedent was healthy before he was shot. But the law is that if the accident aggravates either a pre-existing condition such as a COPD or at least two other conditions which the decedent later gets that basically hasten the death, then the defendant is the responsible party for the wrongful death. Okay. Where's the testimony that links this accident to your client's death? Where's the expert testimony? Sure. Dr. Faber and Dr. Clark both testified. For example, on Dr. Faber, I believe it was pages 36 and 37, testified that the patient is immobilized to a large extent, and they were laying around and make it more difficult to fight pneumonia and make them more... Well, let me ask you about this. A question from the defendant. Is it more probably true than not in your opinion that there is no connection between the car accident and this man's death to Dr. Faber? And he said, I would have to concur with that. He does say that, but I think that testimony has to be read narrowly. Not only narrowly, but I think it has to be read with everything else. I think the way Dr. Faber's testimony is that just the simple fact of being in this car accident did not cause, by itself, if nothing else, did not cause Mr. Lowe to pass away. I mean, he did not die due to neck and back injuries. Nobody's actually disputing the actual cause of death. But what Dr. Faber goes on to say, though, is that those neck and back injuries made his underlying conditions, such as pneumonia and COPD, more difficult to fight. On pages basically towards the end of Dr. Faber's deposition, he says that a patient with this amount of pain is going to be immobilized, they're going to have trouble coughing, they're going to have trouble moving around, and then the pneumonia is going to be that much more of a problem. The same thing that happened in Amagon. The coroner in that case conceded that, yes, Mr. Ruiz could have gotten pneumonia even without being in this accident, but because he was paralyzed, his chances for survival and the rate at which he passed away was much, much greater. How long after this accident did the decedent pass away? The accident was on October 19, 2007, and he passed away, I believe, on August 11, 2009. And Dr. Clark's testimony was very similar, pages 23 to 24. He says that basically he felt he was able to get along before the pain, but after the 2007 accident his pain became much worse. He probably became more depressed to a certain point of an individual who has chronic pain just tires the pain, and therefore they're a lot more immobile. And then Dr. Clark also goes into basically what he died of. Essentially what happened here is it may be helpful to work backwards. For example, here the decedent, everybody agrees, he died of heart failure. So working backwards, the next question is, well, what caused the heart failure? And as Dr. Clark testifies, that basically with chronic, I think the phrase used was endgame. Basically with chronic obstructive pulmonary disease, an individual has insufficient oxygen supply, and therefore the heart has to work harder. And unless basically the heart becomes enlarged and unless something is done to treat that, which I'm not even sure if that's possible, the patient dies from heart failure. So we start with he died of heart failure, which was brought on by the chronic obstructive pulmonary disease, and then the chronic obstructive pulmonary disease was made much worse by the fact that he couldn't move around, he was immobilized, he was in severe pain, and he had depression. And that just made his death happen that much quicker. So I think in this case the trial court actually started off on a very good path. As I mentioned in pages 16 through 17 of my brief, I think the trial judge started on a very correct path, but then I think he didn't carry it through to his logical end. He says based on not only the testimony of the doctors, but also based on the lay testimony that Mr. Lowe basically just became inactive and depressed and his condition deteriorated afterwards, the trial court said the jury could easily conclude he would have more problems coughing, more difficult finding pneumonia, and chronic disease issues that would be accelerated by his condition generally. And he says the jury could easily conclude that the decedent suffered further complications and debilitating effects from the accident on top of the chronic issues he was already having. But I think what's important to point out there is that he's having more debilitating effects from the chronic obstructive pulmonary disease and the pneumonia, which are the conditions which caused the heart failure, which eventually killed him. So as I read the trial court's decision, he's saying that based on Mr. Lowe's preexisting condition, he could have had all kinds of problems. The jury could easily conclude that in his last two years, he was having all kinds of additional problems based on his underlying condition due to being immobilized by the accident. But then the court, I think based on the doctor's testimony, which I think was read way too broadly, but then the court says... What's vague about no connection between the accident and his death? I mean, there's only one way to read that, isn't there? There's no connection. Well, Justice Schmitt, I think I respectfully have to disagree because I suppose the question is what does the word connection mean? And I think it has to be taken in a broader sense in that I think where he's saying no connection is very similar to Dr. Klotz saying he did not die of these injuries. That's true. But what the doctors say later on is that even though these injuries didn't cause him by themselves to pass away, that they made his underlying condition, the COPD and pneumonia, that much more worse because he was basically stuck in the house and couldn't really move around and his condition got gradually worse. In the cases I cited, I think you could say the same thing regarding the other decedents. In DeRosa, the majority opinion took very careful note that the treating doctor said, I wanted to be clear, this decedent died from the cancer and not from the trauma of the car accident. What happened, though, is the car accident dislodged basically what they thought was a bronchogenic carcinoma, dislodged that and made it accelerate that much more quicker. I mean, there the decedent technically died of. Okay. But you were faced with this positive motion. Correct. And you could have gone out and got an expert to say what you want us to assume. And from my look at the record, there is no testimony that goes where you want it to go. I would respectfully disagree with that. And I think the trial court in its ruling kind of recognized that that wasn't true because the trial court is saying we know that he's having many more problems with his condition, including the condition which eventually killed him, the COPD, after the accident because he can't move around. And therefore, I think the critical inquiry is not so much how the expert understands the question as much as it is the factual basis for the opinion. And here they're saying, well, yes, he did not die from these injuries. Nobody disputes that. They are saying his injuries made his underlying medical condition that much more worse. And, unfortunately, it's not always something which how much worse didn't make it, it's always tough to say. I get it. In essence, I would try it another way. Your theory is there is a connection between the accident and the death, right? There is a connection in that it accelerated the death. But the problem with that is the physician says there was no connection, none. Thank you. Well, I think his testimony has to be read broadly. I don't think it's just enough to say that there's no connection. I think that would turn the result of these cases just on how the expert understood the question. For example, in Amagon, I mean, they could have said, the expert could have said, if they understood the question that way, no, he didn't die from the gunshot, he died from the pneumonia. But really what happened is, so the expert could truthfully say he did not die from the injuries he received when he shot, but the expert could say that, and did say that he died from pneumonia, which was made much, much worse because he was paralyzed. And you would have had the opportunity to ask this doctor questions after the defense asked the questions, right? And clear that up. Correct. Did you do that? I thought, well, actually, it was a partner of mine who did the depositions. But that said, I think he did clear up that this is something where, unfortunately, it's not, it's almost very tough to say, did he die six months sooner, did he die two years sooner, how much sooner did he die? But unfortunately, the reason that's not terribly clear is because of the nature of the injury the defendant caused. Even the trial judge says you would be understandably suspicious, but the fact in there is the way the injuries occur, it's not really something which is necessarily subject to calculation or quantification as far as what pain came from this accident, how much sooner he would die. So what do we do, then, let the jury just speculate on that? I think you let the jury decide because there is a sufficient factual basis, and also I think there's a policy in the law that to the extent that there's an indivisible harm or there's speculation as to the extent of the harm, the burden should be borne by the wrongdoer or the tortfeasor rather than the injured party. I don't think a tortfeasor should be able to escape just because it can't be nicely, neatly quantified. So for that reason, we would respectfully request this court reverse the trial court's grant of summary judgment and remand this matter for trial on both counts. Thank you. Thank you, Mr. Angel. Ms. Hackman. May it please the court, counsel. My name is Tamara Hackman. I'm here on behalf of the defendants, BNSF Railway and Leo Jorger. I think the underlying allegations are pretty clear in this case. We have Mr. Lowe, who was allegedly struck by a vehicle driven by Mr. Jorger in October of 2007, and two years later, Mr. Lowe passed away from COPD and congestive heart failure at the age of 71 on August 17, 2009. There was a lawsuit that was filed with two counts in survival and two counts of noncommittal death, and defendants moved for summary judgment with respect to the wrongful death counts, and those were granted by the trial court. As the court correctly recognized, the survival count still remains before the trial court. So the issue before the court is whether the trial court correctly found that the summary judgment should be granted because there was no causal connection between the accident and the death. And I think the parties agreed on the medical history of Mr. Lowe, which was quite extensive before the accident. First of all, there's agreement that both of the physicians testified that he died of congestive heart failure and COPD. Nobody testified, no expert testified that a cause of death was pneumonia. There's no evidence of that in the record. There's no testimony by any expert that pneumonia factored into his death. There was evidence or opinions that he had been diagnosed as having COPD since 1979, and Dr. Faber, who had been the treating physician for 30 years, testified that that COPD had been progressive and unrelenting in its severity. There was testimony that he suffered from depression since 1985, that he had chronic neck and back pain since 1978, and that he also had significant osteoarthritis and degenerative disc disease since 1986. And he was diagnosed by Dr. Faber as having failed back syndrome in 2004, which essentially meant there wasn't anything more that they could do for him. And he had a history of chronic headaches since 2002. And furthermore, even before the accident in 2005, Mr. Lowe had been referred for pain management. So all of these conditions, COPD, depression, chronic neck and back pain, and osteoarthritis, existed before the 2007 accident. And more importantly, neither Dr. Faber or Clark were present when Mr. Lowe died, and neither performed an autopsy. The law is clear in this case, and I won't repeat it because the court's questions are familiar with that law, but this court has said that when there's no affirmative or positive evidence that the defendant proximately caused the plaintiff injuries, the plaintiff fails to establish a genuine issue of material fact on that issue. And I don't think it's disputed. The trial court found two findings. One, that expert testimony was needed in this case. And I don't think plaintiff argues otherwise. So unless the court has questions on that issue, I'm not going to go into it. Thank you, Mrs. Hagman. Oh, I'm sorry. Do you want to go on? I thought you were done. I'm sorry. Unless you have other questions. No, there are no more questions. I would like to point out a few things that I think plaintiff made in argument, but I don't think is in the opinions or in the evidence. He said that the doctors opined that the back and neck injuries made it more difficult to fight the COPD. That's not in the opinions. The only thing that the doctor said anything about was pneumonia, and there's no evidence that he died of pneumonia. There's no evidence or no opinion that he had pneumonia at the time of his death. And in fact, what Dr. Faber said was the last time he saw him was July 16, 2009, which was a month before he died, and he treated him for COPD at that point in time. So there's not even any evidence that he had pneumonia at the time. So interjected throughout the plaintiff's brief is that COPD, the condition made it more difficult to fight COPD, but that's not what the expert said. A couple of other points that I wanted to make as well. The plaintiff argued that the COPD was made worse by his immobility, but the experts didn't say. The only thing the experts talked about was pneumonia and was it more difficult to cough to fight the pneumonia. Nothing was said about whether or not this problem or this accident did anything to aggravate or accelerate the COPD condition that he'd already had for 30 years prior. So I just wanted to point out what I don't think is in the record. So I think the record's clear that there was no opinion from Dr. Faber or Dr. Klock that Lowe's injuries affected his ability to fight COPD. There's no testimony from Dr. Faber or Klock that Lowe's neck or back conditions made Lowe less able to fight COPD. And there's no testimony that the injury aggravated the COPD, which was what they said was the cause of death. There was no testimony that he had pneumonia at the time of his death. In fact, he died in the home and had been released by the hospital, and Dr. Faber said when he last treated him it was for COPD. There was no testimony in the record that the 2007 accident caused Mr. Lowe to be more susceptible to pneumonia. So there's no factual support for the arguments that are being made, and as the court recognizes, there's no expert testimony to suggest that there was any causal connection between the accident and the injury. In fact, the testimony is to the opposite, that there was no causal connection. And for that reason, I would ask that the court affirm the trial court's decision, granting summary judgment on Lowe's death. Thank you, Ms. Hackman. Thank you. Mr. Angel, some rebuttal? Thank you. I would respectfully submit that I do not believe Appellee's counsel's argument is even consistent with what the trial court found. As I indicate on pages 16 and 17 of my brief, the trial court found that based on Mr. Lowe's history, underlying history of COPD and pneumonia after the accident, a jury could easily conclude he's going to have many more problems fighting off those diseases than he would otherwise. Also, I believe it was page 37 of Dr. Faber's death position where he says, a patient such as Mr. Lowe with neck and back injuries is going to have more trouble coughing and they're going to have a lot more difficulty fighting off pneumonia due to their inability to cough and inability to move around. Basically, on pages, Dr. Faber's testimony is very similar, and throughout the cross-examination, where he says if a patient's immobilized to a large extent and laying around a lot, they're going to have difficulty fighting off pneumonia. We all agree with that, but did anybody ask you, ask an expert, well, isn't it true, Dr. Expert, that this accident hastened my client's death? Actually, I think the doctors did say that. I think maybe it wasn't quite as clear as would have been ideal, but Dr. Klock, I believe on pages 21 and 22 of his deposition, did say that Mr. Lowe did have experience in aggravation in terms of his condition, which made his pain much more worse and that basically he's going to have a lot lower activity level as a result of what he had in this accident. And Dr. Klock also explained the science behind chronic obstructive pulmonary disease and pneumonia, which in both cases, it's basically a degradation or clogging of the stroma in the lung tissue, which has to be clear for oxygen gas to be exchanged in any type of obstruction. They're both types of obstruction. And basically, as that builds up, in part due to immobility, the disease gets worse, puts more pressure on the heart, and as a result, the heart works overtime and eventually fails. And the trial court's opinion, I think, recognized as much, other than I think the trial judge just got hung up on the words connection without looking at what the rest of what the doctor said, and I respectfully submit that that all has to be read within context, which is I think what the doctors were saying is that no, these injuries did not cause Mr. Lowe by themselves to pass away, but they made him that much more susceptible to some other condition that he would get. I mean, if he had never gotten pneumonia, if the COPD had stayed the same other way, if he hadn't had the COPD, he probably could have lived about as long with or without the injuries. But the problem is once he gets those conditions, similar to Mr. Ruiz in the admin gun case, he's just that much more susceptible to any conditions such as pneumonia or COPD, which he may get. And that's basically I think what these cases show is admin gun and the present case, they both have essentially the same factual basis, which is if you're not able to move around, you're going to be more susceptible to the COPD and more susceptible to pneumonia whether it occurs before or after the injury. It doesn't really make any difference. These cases recognize that essentially you're going to probably die much sooner than you would otherwise as a result of your injuries from the relevant incident. Mr. Angel, your expert said that these things could happen. He could be more susceptible. He could develop pneumonia. These things could happen. Did either one of them testify that those things did happen? I believe they did. I believe the doctors said that one, I think they said that he is much more susceptible to pneumonia. Did he get pneumonia?  And they said that basically Dr. Clark explained how he basically died from heart failure, which is his heart became enlarged due to pneumonia and the COPD, and I believe he was in the hospital with pneumonia several times before he passed away in 2009. Okay, but that could have happened with or without the accident. Was there any testimony that said it was because of the accident? I don't know if they specifically said that, but the problem I think, Justice McDade, is that it's not something which really lends itself to a precise quantification or calculation. As the Court noted in the DeRosa case, unfortunately here you're talking about probabilities. The DeRosa case, they couldn't say how much sooner the decedent died because of the car accident, which dislodged the carcinoma. But here they're saying he's going to have much more trouble fighting it than he would otherwise, and I don't believe the Court should really make a distinction between opinions that say pain worsened the ability to fight off the COPD or pneumonia, or opinion which said pain reduced life expectancy by some undefined period of time. But he was already on OxyContin before the accident occurred, so his pain was already extensive. May I finish? His pain was extensive, there's no doubt about that, and the injuries from this automobile accident certainly affected him a lot more than they would affect most people, but the testimony was both lay and medical expert testimony, particularly Dr. Klock, that not only did he have an aggravation of the pain, which it's tough to divide which was which, but Dr. Klock said most likely he had an aggravation of pain, which is a medically determinable impairment, and he probably tired of the pain as depression became worse. So not only is it greater there, but there's also testimony that, hey, he actually was able to enjoy life before this accident, and then after that, both lay and medical testimony that his condition just went downhill until he eventually passed away. All right. Thank you, Mr. Angel. Ms. Hackman, thank you. Thank you. This matter will be taken under advisement, a written disposition will be issued, and right now the court will be in recess until 9 o'clock in the morning.